## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NYRON HARRIS,

   Plaintiff,

   v.

STATE OF NEW JERSEY, *et al.*,

   Defendants.

Civil Action No. 18-0707 (RK) (JBD)

**OPINION**

**KIRSCH, District Judge**

   **THIS MATTER** comes before the Court upon Defendants State of New Jersey, Division of State Police of the State of New Jersey, Colonel Rick Fuentes, Colonel Patrick Callahan, and Lieutenant Joseph Netti's[1] Motion for Summary Judgment. (ECF No. 46.) Plaintiff Nyron Harris filed a response to Defendants' Statement of Material Facts, (ECF No. 64), but no opposition brief.[2] Defendants replied. (ECF No. 65.) Plaintiff then filed a supplement to its response to Defendants' Statement of Material Facts. (ECF No. 70.) Defendants opposed Plaintiff's supplement. (ECF Nos. 78–79.) The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED**.

---

[1] Defendants' filings refer to Defendant Joseph "Nitti." The Court assumes for purposes of this Opinion that those filings reflect the appropriate spelling of Mr. Nitti's surname.

[2] A party's failure to respond to a motion for summary judgment argument is sufficient for a court to "find the argument abandoned or waived." *Smart v. Cnty. of Gloucester*, No. 20-12408, 2024 WL 343261, at *4 (D.N.J. Jan. 29, 2024); *see also McCowan v. City of Phila.*, 603 F. Supp. 3d 171, 193 (E.D. Pa. 2022) ("The Third Circuit and other appellate courts agree that when a plaintiff fails to raise an argument in opposition to a motion for summary judgment, it is waived, and she cannot later argue the issue on appeal.").

## I.    BACKGROUND

This First Amendment retaliation and race discrimination case arises from the New Jersey State Police's internal investigation of Plaintiff's inappropriate social media post and the subsequent findings of misconduct that led to the denial of his reenlistment. Plaintiff, a former New Jersey State Trooper, graduated from the New Jersey State Police Academy in 2013. He was denied reenlistment[3] four years later in August 2017. In December 2017, Plaintiff filed a complaint in New Jersey state court, alleging First Amendment retaliation and race discrimination. In January 2018, Defendants removed the case to federal court. Around the same time, in 2018, Plaintiff filed an Equal Employment Opportunity ("EEO") complaint with the New Jersey State Police, alleging race discrimination. In 2022, during the pendency of this litigation, the EEO office found that there was no evidence of race discrimination in either the investigation of Plaintiff's inappropriate social media post or the decision not to reenlist him. Now before this Court is Defendants' Motion for Summary Judgment.

### A.    UNDISPUTED FACTS

The facts recited in this Section are not in dispute. Plaintiff is a former New Jersey State Trooper. (ECF No. 46-2 ("Defs. SUMF") ¶ 1; ECF No. 64 ("Pl. SUMF Response") ¶ 1.) He identifies as a Black male. (*Id.*) Plaintiff graduated from the New Jersey State Police Academy in 2013 and was stationed at the Cranbury Station in Cranbury, New Jersey. (Defs. SUMF ¶¶ 2, 4; Pl. SUMF Response ¶¶ 2, 4; *see also* ECF No. 1 ("Compl.") ¶ 2 (listing Plaintiff's graduation date as October 4, 2013).)[4] Plaintiff was due for reenlistment in October 2017. (Defs. SUMF ¶¶ 3, 123;

---

[3] The New Jersey State Police requires trooper reenlistment after two years of service, four years of service, and five years of service. (Compl. ¶ 4.)

[4] The Court notes the typographical error in Defendants' Statement of Material Facts, which incorrectly lists Plaintiff's graduation date as "October 4, 2023." (Defs. SUMF ¶ 2.)

Pl. SUMF Response ¶¶ 3, 123.) In August 2017, the New Jersey State Police informed Plaintiff that it declined to reenlist him. (Defs. SUMF ¶ 122; Pl. SUMF Response ¶ 122.)

### 1. The T-Shirt Incident and the Immediate Aftermath

While Plaintiff was employed as a trooper, his cousin, Dashawn Oxford, sold t-shirts online. (Defs. SUMF ¶ 5; Pl. SUMF Response ¶ 5.) Plaintiff loaned Oxford $1,500 in support of his t-shirt business, Royal Clothing Company. (Defs. SUMF ¶ 6; Pl. SUMF Response ¶ 6.) That loan was not disclosed to the New Jersey State Police. (*Id.*) On September 10, 2016, Oxford sent Plaintiff an image of a t-shirt featuring nine Black women. (Defs. SUMF ¶ 7; Pl. SUMF Response ¶ 7.) Depicted on that t-shirt, above the text "Black Excellence," were several "well-respected and historical African American leaders such as Harriet Tubman and Maya Angelou." (Defs. SUMF ¶ 8; Pl. SUMF Response ¶ 8; *see also* ECF No. 46-3 at 125.)

The t-shirt also displayed alongside these esteemed historical figures an image of Joanne Chesimard—a notorious fugitive who murdered New Jersey State Trooper Werner Foerster. (Defs. SUMF ¶¶ 8, 10, 12; Pl. SUMF Response ¶¶ 8, 10, 12; *see also* ECF No. 46-3 at 125.) In 1973, Foerster was shot four times during a traffic stop for a broken taillight. Arun Venugopal, *Sundiata Acoli freed after serving nearly 50 years for role in killing of state trooper*, *Spotlight News* (May 26, 2022), https://www.njspotlightnews.org/2022/05/sundiata-acoli-state-trooper-werner-killed-foerster-joanne-chesimard-black-liberation-army-nj-turnpike/.[5] Chesimard and two men were in the vehicle; they were all members of the Black Liberation Army. Trooper Werner Foerster, *Officer Down Memorial Page*, https://www.odmp.org/officer/4964-trooper-werner-foerster (last visited Mar. 31, 2025). Foerster, a United States Army Vietnam veteran, was 34 years old at the

---

[5] The Court takes judicial notice of the circumstances surrounding Trooper Foerster's murder as a matter of public record. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

time of his death, leaving behind his wife and two children. *Id.* In 1977, Chesimard was convicted of first-degree murder but escaped from prison in 1979. (Defs. SUMF ¶¶ 12–13; Pl. SUMF Response ¶¶ 12–13.) She is wanted by the Federal Bureau of Investigation ("FBI") and has been on its "Most Wanted Terrorists" list since 2013. (Defs. SUMF ¶¶ 14–15; Pl. SUMF Response ¶¶ 14–15.) Even fifty years after the killing, the FBI's reward for Chesimard's capture is $1,000,000. (Defs. SUMF ¶ 14; Pl. SUMF Response ¶ 14.) Plaintiff shared the image of the t-shirt depicting Chesimard on his personal Instagram account on September 10, 2016. (Defs. SUMF ¶ 9; Pl. SUMF Response ¶ 9.)

Trooper II "A. Serafin" saw Plaintiff's t-shirt post and reported it to the Squad Leader at Cranbury Station, Staff Sergeant Doyle. (Defs. SUMF ¶ 16; Pl. SUMF Response ¶ 16.) Doyle reported the post to Sergeant First Class "J. Conners," who sent the image to Lieutenant Stephen Karmilovich. (Defs. SUMF ¶ 17; Pl. SUMF Response ¶ 17.) Karmilovich initiated an Office of Professional Standards ("OPS") investigation into Plaintiff's post by submitting a "Reportable Incident Form." (Defs. SUMF ¶¶ 17, 117; Pl. SUMF Response ¶¶ 17, 117.) Plaintiff's post also circulated within the private Facebook group, "THE OUTFIT," which is comprised of both current and retired New Jersey State Troopers. (Defs. SUMF ¶ 18; Pl. SUMF Response ¶ 18.) One of the members of this Facebook group expressed, "everyone knows who [sic] side [Plaintiff] is on, and what side he would take." (Defs. SUMF ¶ 20; Pl. SUMF Response ¶ 20; *see also* ECF No. 46-3 at 128.) Plaintiff admitted in his deposition that his social media post could cause a lack of harmony, upset fellow troopers, or cause them to not trust him. (Defs. SUMF ¶ 46; Pl. SUMF Response ¶ 46; *see also* Pl. Tr.[6] at 45:1–9.)

---

[6] (*See* ECF No. 46-3 at 131–137.)

Over the weekend of September 11, 2016, Troopers Josh Ladao and Devor Keizer sent text messages to Plaintiff informing him that Cheismard was depicted on the t-shirt that he posted and that the image was "going around among troopers." (Defs. SUMF ¶ 20; Pl. SUMF Response ¶ 20.) Plaintiff subsequently removed the image from his Instagram account. (Defs. SUMF ¶ 21; Pl. SUMF Response ¶ 21.) Plaintiff confirmed during the OPS investigation that he was familiar with Chesimard based on his police training and had seen her image in State police stations "more times than he could count." (Defs. SUMF ¶ 50; Pl. SUMF Response ¶ 50.) Two months after Plaintiff removed the image of the t-shirt, he "liked" a photograph of individuals wearing the t-shirt on his personal Instagram account. (Defs. SUMF ¶¶ 51–52; Pl. SUMF Response ¶¶ 51–52.)

On September 12, 2016, Karmilovich informed Plaintiff that he had been reassigned to the Office of the Deputy Superintendent of Administration. (Defs. SUMF ¶ 22; Pl. SUMF Response ¶ 22.) On October 29, 2016, Detective Sergeant First Class Joseph Nitti and Captain Mark Santiago, the Internal Affairs Bureau Chief, informed Plaintiff that he was "relieved of his duty weapon, police powers and authority of the police and could no longer act on behalf of the [New Jersey State Police]." (Defs. SUMF ¶ 23; Pl. SUMF Response ¶ 23.)

## 2.  The Office of Professional Standards Investigation

OPS opened an investigation into Plaintiff's post. (Defs. SUMF ¶ 24; Pl. SUMF Response ¶ 24.) The investigation uncovered evidence of Plaintiff's repeated associations with known and established gang members, none of which Plaintiff disputes. (Defs. SUMF ¶¶ 84–85, 87–90, 92–108; Pl. SUMF Response ¶¶ 84–85, 87–90, 92–108.) OPS found that Plaintiff was very close with his cousin Oxford, as they "went to college together, formed [the Top Gunnerz Motorcycle Club] together, purchased a house together, and founded Royalty Clothing Company together." (Defs. SUMF ¶¶ 5, 84; Pl. SUMF Response ¶¶ 5, 84.) Because of their close relationship, OPS reviewed photographs from Oxford's Instagram account. (Defs. SUMF ¶ 85; Pl. SUMF Response ¶ 85.)

Nitti forwarded some of these photographs and photographs related to Plaintiff's social media accounts to "various intelligence agencies and certified gang experts," including Captain Toni Ann Mattia and Detective John Marcelli of the Essex County Prosecutor's Office and Detective Nancy Petrara-Stafyleras of the Passaic County Prosecutor's Office. (Defs. SUMF ¶¶ 25, 29–30, 88; Pl. SUMF Response ¶¶ 25, 29, 29–30, 88.) Their analysis of the photographs positively revealed "indicia of gang affiliation such as the use of red clothing, Cincinnati Reds baseball hats, and hand signs specific to the Fruit Town Brims Bloods Street Gang, the 'home' chapter of the Bloods faction in Newark." (Defs. SUMF ¶¶ 23, 32, 85, 88, 90; Pl. SUMF Response ¶¶ 23, 32, 85, 88, 90.) The images featured "Plaintiff and Oxford associating with groups of individuals wearing red clothing, including Cincinnati Reds baseball hats, and displaying hand signs." (Defs. SUMF ¶ 27; Pl. SUMF Response ¶ 27.) In addition, individuals in the photographs were "engaging in activity and behavior consistent with the Bloods Street Gang." (Defs. SUMF ¶ 31; Pl. SUMF Response ¶ 31.) Nitti showed Plaintiff a photograph in which Plaintiff was wearing a Cincinnati Reds hat and asked if Plaintiff was a member of the Bloods; Plaintiff replied, "No." (Defs. SUMF ¶¶ 36–37; Pl. SUMF Response ¶¶ 36–37.) When questioned about his training on gangs, Plaintiff indicated that red clothing and specific hand signs were gang identifiers, but he stated that "the clothing, color choices, and hand signs" in his and Oxford's photographs were "based on fashion and hip-hop culture." (Defs. SUMF ¶¶ 100–101; Pl. SUMF Response ¶¶ 100–101.) The gang experts' analysis ultimately connected Oxford to over 60 members of the Bloods Street Gang, including Bloods gang member Donald "Monk" Oliver. (Defs. SUMF ¶ 92; Pl. SUMF Response ¶ 92.) Plaintiff and Oliver followed each other on social media. (*Id.*)

The OPS investigation also revealed a connection between the motorcycle club that Plaintiff founded with his cousin, Top Gunnerz, and Thug Riders. (Defs. SUMF ¶ 93; Pl. SUMF

Response ¶ 93.) Thug Riders is a criminal organization known as a "one-percent outlaw motorcycle gang." (Defs. SUMF ¶ 28; Pl. SUMF Response ¶ 28.) Images on Oxford's Instagram account depict him in a Top Gunnerz vest socializing at the Thug Riders clubhouse. (Defs. SUMF ¶ 104; Pl. SUMF Response ¶ 104.) The gang experts opined that if an individual "wears their own colors to another club's clubhouse known as an outlaw motorcycle club, that club will be considered an associate club or a support club." (Defs. SUMF ¶ 94; Pl. SUMF Response ¶ 94.) Plaintiff and Ruben Morales, the president of Thug Riders, also followed each other on social media. (Defs. SUMF ¶¶ 93, 95; Pl. SUMF Response ¶¶ 93, 95.) Plaintiff, who was president of Top Gunnerz for eight years, admitted that he initially lied to Nitti about not knowing current members of Top Gunnerz and was later able to identify various members when Nitti showed him photographs. (Defs. SUMF ¶¶ 96–99; Pl. SUMF Response ¶¶ 96–99.) Plaintiff also initially denied any relationship between Top Gunnerz and Thug Riders but later indicated that he was friends with the former president of Thug Riders and knew of its "innerworkings." (Defs. SUMF ¶¶ 102–103; Pl. SUMF Response ¶¶ 102–103.)

On October 28, 2016, the New Jersey State Police's Intelligence Center Unit and Organized Crime and Street Gang Unit conducted surveillance of a Top Gunnerz Halloween party, where the clothing color theme was red and photographs from the event revealed gang hand gestures. (Defs. SUMF ¶ 53; Pl. SUMF Response ¶ 53.) At the time, Plaintiff was vice-president of Top Gunnerz. (Defs. SUMF ¶ 54; Pl. SUMF Response ¶ 54.) During the surveillance, officers observed Plaintiff's vehicle outside of the party and noted the scent of marijuana emanating from the clubhouse and Plaintiff's vehicle. (Defs. SUMF ¶ 55; Pl. SUMF Response ¶ 55.)

In addition to these questionable associations, OPS found that Plaintiff disobeyed a written order when he traveled on separate occasions to Dallas, New Orleans, Myrtle Beach, Miami, and

Amsterdam with Oxford without submitting a travel itinerary. (Defs. SUMF ¶¶ 57–58; Pl. SUMF Response ¶¶ 57–58.) Although Plaintiff believed that he only had to submit a travel itinerary for international trips, he still failed to submit one for his Amsterdam trip. (Defs. SUMF ¶ 59; Pl. SUMF Response ¶ 59.)

OPS also found that Plaintiff disobeyed a verbal order from his former supervisor. (Defs. SUMF ¶¶ 71–72; Pl. SUMF Response ¶¶ 71–72.) Plaintiff received a verbal warning from his former supervisor, Lieutenant Dittmar, to refrain from sharing inappropriate images on social media, after which he shared on social media an image of his son at the New Jersey State Police Hamilton Station. (Defs. SUMF ¶¶ 71–72; Pl. SUMF Response ¶¶ 71–72.) The post violated the New Jersey State Police's social media policy, which prohibits sharing "State Police emblems, logos, troopers and equipment on personal social media accounts." (Defs. SUMF ¶ 73; Pl. SUMF Response ¶ 73; *see also* ECF No. 46-3 at 75.) Plaintiff's supervisor told him to remove the post and refrain from posting future inappropriate images. (Defs. SUMF ¶ 74; Pl. SUMF Response ¶ 74.)

In addition, when assigned to Cranbury Station, Plaintiff was given a warning book in which to record all verbal and handwritten warnings issued during motor vehicle stops. (Defs. SUMF ¶ 76; Pl. SUMF Response ¶ 76.) Nitti presented Plaintiff with sixteen motor vehicle warnings that "appeared to be falsely issued." (Defs. SUMF ¶ 78; Pl. SUMF Response ¶ 78.) Plaintiff admitted that he "failed to properly fill out the warnings" and, at least in one instance, falsely entered a warning as "issued" in the New Jersey State Police's automated dispatch system when his warning book was blank. (Defs. SUMF ¶¶ 79–81; Pl. SUMF Response ¶¶ 79–81.) Plaintiff had also documented another warning number in the system from a prior station, which

was unrelated to any warnings in his Cranbury Station warning book. (Defs. SUMF ¶ 82; Pl. SUMF Response ¶ 82.)

Finally, while some of the facts regarding Plaintiff's share in the profits of Royal Clothing Company and Top Gunnerz are in dispute, as detailed below, other facts regarding his involvement are not. Plaintiff admitted that he "invested in the [Royal Clothing Company], contributed to marketing and sale of products, and received payment for goods." (Defs. SUMF ¶ 47; Pl. SUMF Response ¶ 47.) Plaintiff also admitted that he was aware of the State Police Outside Employment Policy but "failed to obtain approval from the Office of Labor Relations" regarding his involvement in Royal Clothing Company. (Defs. SUMF ¶ 63; Pl. SUMF Response ¶ 63.) Regarding Top Gunnerz, Plaintiff initially denied that the club generated revenue, but he registered Top Gunnerz as a fictitious business in 2008 to transact business in the club's name. (Defs. SUMF ¶¶ 66–67; Pl. SUMF Response ¶¶ 66–67.) When Nitti confronted him with this fact, Plaintiff admitted that the club generated revenue but stated that Oxford was "in charge" of it. (Defs. SUMF ¶¶ 67–68; Pl. SUMF Response ¶¶ 67–68.)

Based on these findings and the Chesimard t-shirt incident, OPS deemed substantiated seven "allegations" against Plaintiff: (1) "nine counts of inappropriate social media postings," (2) "two counts of questionable off-duty conduct," (3) "six counts of disobeying orders," (4) "two counts of unauthorized employment," (5) "one count of disobeying a verbal order," (6) "forty-six counts of intentional false reports," and (7) "multiple counts of questionable associations." (Defs. SUMF ¶ 41; Pl. SUMF Response ¶ 41.)

### 3.   The Denial of Plaintiff's Reenlistment

On May 10, 2017, Plaintiff testified before the New Jersey State Police Reenlistment Board. (Defs. SUMF ¶ 113; Pl. SUMF Response ¶ 113.) The Board consisted of eight members: Major Glen Szenzenstein, Lieutenant Thomas Cavallo, Major John Baldosaro, Captain Jeanne

Hengemuhle, Major Francis Donlan, Major Michael Devlin, Captain Frank Manghisi, and Major Eric Heitmann. (Defs. SUMF ¶ 114; Pl. SUMF Response ¶ 114.)

On June 15, 2017, the Board issued a report, authored by Cavallo, summarizing Plaintiff's appearance and memorializing the Board's recommendation not to reenlist Plaintiff. (Defs. SUMF ¶ 115; Pl. SUMF Response ¶ 115.) The Board acknowledged that Plaintiff's performance evaluations did not include any "notable deficiencies" and that he was "consistently a top performer in the traffic enforcement program at Cranbury Station" from January 2015 to October 2015. (Defs. SUMF ¶ 116; Pl. SUMF Response ¶ 116.) The Board also "highlighted language" from Karmilovich's report regarding the Chesimard t-shirt incident. (Defs. SUMF ¶ 117; Pl. SUMF Response ¶ 117.) In addition, the Board concluded, based on its questioning of Plaintiff, that he had "avoided taking responsibility," "showed no remorse for any questionable activity that he may have been associated with," and was "unable to recognize his poor choices in judgment and decision making." (Defs. SUMF ¶ 118; Pl. SUMF Response ¶ 118.)

On July 31, 2017, the Board memorialized its final decision not to reenlist Plaintiff, stating the following:

> Tpr. Harris lacked sound moral character and the integrity necessary to continue a New Jersey State Trooper. These fundamental character flaws cannot be overcome or remedied through additional training, mentoring, or disciplinary processes. Tpr. Harris' actions of misconduct and behavior demonstrated that he could not be entrusted with the responsibilities given to law enforcement officers, nor is he fit to uphold core values of Honor, Duty, and Fidelity.

(Defs. SUMF ¶¶ 120–121; Pl. SUMF Response ¶¶ 120–121.) Plaintiff was informed of the reenlistment decision in August 2017. (Defs. SUMF ¶ 122; Pl. SUMF Response ¶ 122.)

### 4.   Plaintiff's Alleged Comparators

Plaintiff has identified three similarly-situated Caucasian troopers, whom he alleges engaged in more egregious conduct and were permitted to remain troopers—Troopers Thomas

Brennan, Kaan Akyol, and Richard Maliszewski. (Defs. SUMF ¶ 124; Pl. SUMF Response ¶ 124.) Brennan, who was involved in an alcohol-related accident, was suspended for 90 days without pay and allowances and was subject to an "independent alcohol and five-point promotional deduction for four years." (Defs. SUMF ¶ 125; Pl. SUMF Response ¶ 125.) Akyol allegedly shared racist statements and sent racist text messages. (Defs. SUMF ¶ 126; Pl. SUMF Response ¶ 126.) OPS opened an investigation, but, before the disciplinary process, Akyol was involved in a criminal matter. (Defs. SUMF ¶¶ 127–128; Pl. SUMF Response ¶¶ 127–128.) As part of that criminal proceeding, he forfeited his public employment and was disqualified from serving as a trooper. (Defs. SUMF ¶ 129; Pl. SUMF Response ¶ 129.) According to Plaintiff, Maliszewski "stole time" and lied about his whereabouts while on duty. (Defs. SUMF ¶ 130; Pl. SUMF Response ¶ 130.) There are no OPS records regarding this alleged misconduct. (Defs. SUMF ¶ 131; Pl. SUMF Response ¶ 131.) Maliszewski received counselling in lieu of formal discipline regarding "other issues, such as failing to document a return to single patrol from dual patrol." (Defs. SUMF ¶ 132; Pl. SUMF Response ¶ 132.)

### 5.  The Equal Employment Opportunity Office's Investigation

After the Board denied Plaintiff reenlistment, he filed a complaint with the Equal Employment Opportunity ("EEO") office, alleging that the New Jersey State Police, through Nitti, "conducted a racially biased investigation" and that the Board did not reenlist him "because of his race." (Defs. SUMF ¶ 134; Pl. SUMF Response ¶¶ 134.) The EEO investigated Plaintiff's complaint, finding that Plaintiff's allegations were "unsubstantiated" and that the Board based his non-reenlistment on Plaintiff's substantiated misconduct. (Defs. SUMF ¶¶ 134–135, 141; Pl. SUMF Response ¶¶ 134–135, 141.) The EEO found that Nitti's interview questions were not racially motivated but, rather, were based on photographic evidence and gang expert analysis. (Defs. SUMF ¶¶ 136–137; Pl. SUMF Response ¶¶ 136–137.) The EEO also concluded that the

OPS investigation was initiated after Plaintiff's fellow troopers reported him for promoting the sale of the Chesimard t-shirt and, therefore, Nitti did not retaliate against Plaintiff based on race. (Defs. SUMF ¶¶ 138–139; Pl. SUMF Response ¶¶ 138–139.) Finally, the EEO determined that there was no evidence suggesting that Nitti leaked confidential information related to Plaintiff's OPS interview to anyone. (Defs. SUMF ¶ 140; Pl. SUMF Response ¶ 140.)

### B. DISPUTED FACTS

Of the 141 facts identified in Defendants' Statement of Material Facts, Plaintiff disputes only ten. (Pl. SUMF Response ¶¶ 33, 42–44, 47, 61, 62, 69, 86, 91.) First, Plaintiff denies that there are images featuring him "displaying hand signs specific to the Fruit Town Brims Bloods Street Gang, the 'home' chapter of the Bloods faction in Newark." (Defs. SUMF ¶ 33; *id.* ¶ 33.) To support his denial, Plaintiff cites to the transcript of Nitti's deposition. (Pl. SUMF Response ¶ 33.) In the cited portion, Nitti was asked if he is "aware of [Plaintiff] being criminally charged with anything as it relates to any affiliation with the Crips as a street gang," to which Nitti answered, "No." (Nitti Tr.[7] at 59:6–9.)

Plaintiff also asserts that the following fact is "[u]nsupported by the record": "Nitti found that Plaintiff repeatedly posted images relating to State Police emblems, logos, troopers and equipment" on his personal social media accounts, "in violation of the social media policy." (Defs. SUMF ¶ 42; Pl. SUMF Response ¶ 42.) The record document cited by Defendants to support this fact is an interoffice memorandum from the Office of the Attorney General's Department of Law and Public Safety, dated July 20, 2022, from Chief Administrative Officer William Cranford to Joanne Stipick, the Director of the EEO office. (ECF No. 46-3 at 17.) The memorandum states that "Nitti found that Harris had repeatedly posted images related to State Police emblems, logos,

---

[7] (ECF No. 64 at 9–51.)

troopers, and equipment on his personal Instagram and Facebook accounts in violation of the social media policy." (*Id.*)

Furthermore, Plaintiff denies that "Nitti found that Plaintiff's social media posts appeared to support individuals like Chesimard, ideologies similar to that of the Black Liberation Army, and 'anti-police ideologies.'" (Defs. SUMF ¶ 43; Pl. SUMF Response ¶ 43.) Plaintiff cites to Nitti's deposition transcript in support of his denial. (Pl. SUMF Response ¶ 43.) In the cited portion, Nitti testified, "It just appeared that there's a lot of verbiage about power and people . . . it just seems consistent with some of the things that were being said in the '60s." (Nitti Tr. at 25:2–5.) Nitti continued, "I wasn't a hundred percent sure. I didn't really know, but I wasn't sure. It was something that I felt like we needed to at least look at and vet, vet it out, make sure there was nothing there." (*Id.* at 6–9.)

In addition, Plaintiff states that the following fact is unsupported by the record: "[a]ccording to the Department of Justice, the Black Liberation Army, originating in 1971, is an urban guerilla group whose two primary goals are killing police officers and expropriating funds from capitalists and imperialists to finance their revolution." (Defs. SUMF ¶ 44; Pl. SUMF Response ¶ 44.) Defendants support this fact by citing to a publicly available document published by the Maryland State Police and made available online by the United States Department of Justice. (Defs. SUMF ¶ 44 (citing *Maryland State Police, Black Liberation Army: Understanding - Monitoring - Controlling* 4 (U.S. Dep't of Justice Nat'l Inst. of Justice 1991), https://www.ojp.gov/ncjrs/virtual-library/abstracts/black-liberation-armyunderstanding-monitoring-controlling).) The document states that the "Black Liberation Army originated in 1971" and had "two primary goals: to kill 'cops' (then seize control of their communities and liberate black people from repression) and to expropriate funds from the capitalists and imperialists

(financing the revolution and taking back the wealth robbed from blacks through slave labor.)." (*Id.*)

Plaintiff also disputes three facts related to his involvement in his cousin's clothing company. Specifically, Plaintiff denies that (1) "[t]he OPS investigation found that Plaintiff was co-owner of Royalty Clothing Company, which he operated with Oxford"; (2) "[t]he OPS investigation revealed that Plaintiff was co-owner, investor and active participant in the Royalty Clothing Company"; and (3) "Plaintiff initially claimed he was only an investor, but when confronted with social media posts and other online conversations . . . he admitted that his role included marketing, sales, and acceptance of payments." (Defs. SUMF ¶¶ 47, 61–62; Pl. SUMF Response ¶¶ 47, 61–62.) Plaintiff supports his denial of all three facts by citing to the same portion of Nitti's deposition transcript. (Pl. SUMF Response ¶¶ 47, 61–62.) In the cited testimony, Nitti testified that Plaintiff "initially told his squad that he was a partner in the business." (Nitti Tr. at 36:9–10.) Nitti stated that Plaintiff was "investing money" in the business but was also "taking orders through social media," "posting the pictures . . . technically marketing" and "taking payment through social media." (*Id.* at 36:11–16.) When asked about other evidence demonstrating that Plaintiff was a co-partner apart from social media posts, Nitti testified that Plaintiff and his cousin live together and "run" a motorcycle club together. (*Id.* at 36:19–23.) When pressed further about whether there was "anything [he] did to determine" that Plaintiff "actually received money for sales," Nitti answered, "No . . . we didn't pull [Plaintiff's] bank records." (*Id.* at 38:7–13.)

In addition, Plaintiff denies that "Nitti contacted Special Agent Bruce Stuck from the New Jersey Department of the Treasury who indicated that Royalty Clothing Company and Top Gunnerz should have been registered with the State as a business." (Defs. SUMF ¶ 69; Pl. SUMF Response ¶ 69.) Plaintiff contends that, in Paragraph 67 of their Statement of Material Facts,

Defendants state that Plaintiff "did register the business." (Pl. SUMF Response ¶ 69.) In Paragraph 67, Defendants assert, "[t]he OPS investigation found that Plaintiff registered Top Gunnerz as a fictitious business in 2008 to transact business in the club's name." (Defs. SUMF ¶ 67.)

Finally, Plaintiff denies two facts related to Plaintiff's use of "gang indicators." (Defs. SUMF ¶¶ 86, 91; Pl. SUMF Response ¶¶ 86, 91.) Specifically, Plaintiff denies that "[t]he review produced images of Plaintiff, Oxford, and members of Top Gunner[z] in group photos using hand signs indicative of street gang association" and that "Plaintiff and Oxford both exhibited these gang indicators in the photographs." (*Id.*) Plaintiff supports his denial of both facts by citing to the same portion of Nitti's deposition transcript. (Pl. SUMF Response ¶¶ 86, 91.) In the cited testimony, Nitti was asked if he discovered "any information that Nyron Harris was a member of Thug Riders," to which Nitti answered, "No." (Nitti Tr. at 70:20–22.) Nitti testified that he recalls one photograph featuring members of Top Gunnerz and Thug Riders together, but he did not remember whether Plaintiff was in that photograph. (*Id.* at 73:17–74:9.) When asked whether he saw any other photographs depicting Plaintiff "solely" with members of Thug Riders, Nitti testified, "No." (*Id.* at 74:18–75:1.)

### C. OFFICE OF PUBLIC INTEGRITY AND ACCOUNTABILITY REPORT

On December 27, 2024, Plaintiff supplemented the record with a copy of a report from the Office of Public Integrity and Accountability Special Investigations Bureau ("OPIA"), dated September 22, 2024. (ECF No. 77 at 5–32.) The report, portions of which are redacted, details OPIA's observations and recommendations regarding certain members of OPS, specifically Nitti. (*Id.* at 5.) The report focuses on four OPS investigations. (*Id.* at 17–18.) Three of these investigations were born out of the same anonymous letter alleging that an employee of the New Jersey State Police "made racist comments against a Black colleague claiming that [this colleague's] promotion was based on his race." (*Id.* at 18.) OPS found these allegations to be

unfounded on grounds that "there was insufficient evidence uncovered to support the allegations." (*Id.*) Nitti then opened a new OPS investigation to determine the origins of the anonymous letter. (*Id.*) As part of that investigation, Nitti directed another OPS member to have the New Jersey State Lab test the anonymous letter for DNA after Nitti was ordered not to do so. (*Id.* at 19.) Nitti later denied being aware that the envelope was tested for DNA. (*Id.*) In connection with this same investigation, Nitti texted his supervisor who was reviewing a draft of the OPS report asking about the status of the review, stating "I hope you guys don't pussy out lol." (*Id.* at 22.) Nitti also sent two different drafts of OPS's allegations and conclusions in that same investigation to a New Jersey State Police member outside of OPS. (*Id.* at 30.) Nitti claimed that he inadvertently sent the first draft to this outside member but made no mention of the second draft. (*Id.* at 31.) Finally, Nitti sent a text message related to "an ongoing investigation of a trooper who was arrested for allegedly giving a beer to, and inappropriately touching, a 14-year-old girl." (*Id.*) In that text, he stated, "Can we at least see a pic of her. I'd like to see what all of the hub bub is about." (*Id.*) As OPIA determined, Nitti's comment "clearly and inappropriately objectifie[d] an alleged underage victim of sexual misconduct by a trooper." (*Id.* at 22.)[8]

Based on these findings, OPIA sustained the following allegations of rule violations against Nitti: (1) inappropriate standard of conduct-insubordination, (2) culpably inefficient supervision, (3) two counts of questionable conduct on duty, (4) breach of confidentiality regarding an internal affairs investigation, and (5) two counts of candor violations. (*Id.* at 29–32.) At the time that the OPIA report issued, Nitti had already retired from the New Jersey State Police. (*Id.* at 32.) However, according to OPIA, Nitti's termination would have been appropriate based on these violations. (*Id.*)

---

[8] The Court shares OPIA's view that the subject text message was reprehensible.

### D. Procedural History

On December 13, 2017, Plaintiff filed the Complaint in New Jersey Superior Court, Law Division, Mercer County (Docket No. MER-L-2664-17), alleging race discrimination and First Amendment retaliation. (ECF No. 1-2 at 5.)[9] On January 17, 2018, Defendants removed the action pursuant to federal question jurisdiction. (ECF No. 1 ¶ 5.) On February 5, 2018, Defendants answered. (ECF No. 5.) On July 10, 2018, the Court administratively terminated the case pending resolution of Plaintiff's EEO investigation. (ECF No. 9.) The case was reopened in September 2022. (ECF No. 24.)

On October 13, 2023, Defendants moved for summary judgment. (ECF No. 46.) The Court administratively terminated the Motion on October 24, 2023, in light of the parties' ongoing settlement discussions. (ECF No. 52.) On May 8, 2024, the Court reinstated the Motion. (ECF No. 59.) Plaintiff filed a response to Defendants' Statement of Material Facts, and Defendants replied. (ECF Nos. 64–65.) Plaintiff has not filed a brief in opposition to Defendants' Motion.

On December 27, 2024, Plaintiff filed a letter, seeking to supplement the record with a copy of OPIA's September 22, 2024 report. (ECF No. 77.) Defendants opposed the Court's consideration of this supplement. (ECF No. 78–79.)

Defendants' Motion for Summary Judgment is now ripe for decision. For the reasons that follow, the Court will grant summary judgment in Defendants' favor.

## II. <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[9] Plaintiff brought a third claim against former Attorney General of New Jersey, Christopher Porrino, alleging his failure to "right th[e] wrong" against Plaintiff. (ECF No. 1-2 at 5.) On October 13, 2023, the parties stipulated to the voluntary dismissal of this claim with prejudice. (ECF Nos. 45, 48.)

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court is "not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question." *Hammonds v. Collins*, No. 12-00236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing *Brooks v. Am. Broad. Companies, Inc.*, 999 F.2d 167, 172 (6th Cir. 1993); *Comfort Trane Air Conditioning Co. v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir. 1979)); *see also Heffron v. Adamar of New Jersey, Inc.*, 270 F. Supp. 2d 562, 574–75 (D.N.J. 2003) ("[I]n order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on vague, self-serving statements which are unsupported by specific facts in the record." (internal quotation marks omitted)).

The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[T]he party opposing summary judgment must produce evidence which could be 'reduced to admissible evidence' at trial." *ABD Monroe, Inc. v. Monroe Twp.*, No. 04-1412, 2008 WL 58876, at *4 (D.N.J. Jan. 3, 2008) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 327 (1986)). That is, the party seeking to introduce such evidence "must demonstrate that she will be able to reduce it to an admissible form at trial." *Jasmin*

*v. N. J. Econ. Dev. Auth.*, No. 16-1002, 2020 WL 3411171, at *8 (D.N.J. June 22, 2020). The court

must view all facts "in the light most favorable to the nonmoving party." *Turco*, 935 F.3d at 161.

## III.    DISCUSSION

### A.  THE OPIA REPORT

Before reaching the merits of Plaintiff's claims, the Court first addresses Plaintiff's

supplement to the record—the OPIA report. Plaintiff argues that the New Jersey Attorney

General's Office has deemed Nitti "totally uncredible." (ECF No. 77 at 1.) Plaintiff acknowledges

that the OPIA report did not concern OPS's investigation of Plaintiff. (*Id.* at 2–3.) However,

Plaintiff contends that, given Defendants' "significant reliance upon the work and reports of

defendant N[i]tti[,] . . . it is essential that the reliance be viewed alongside this report." (*Id.* at 3.)

He argues that the report is "extremely probative of defendant N[i]tti's character, investigative

practices, and truthfulness." (*Id.*) While the Court is not convinced that Plaintiff will be able to

reduce certain information in the OPIA report to a form admissible at trial, Defendants have raised

no such objection. Thus, for purposes of this Opinion, the Court will assume the admissibility of

the information in the report.

Yet, even permitting supplementation of the record to include this report, the Court finds

that the material facts upon which this Court relies in reaching its determination remain undisputed.

The Court disagrees that the Office of the Attorney General has deemed Nitti "totally uncredible."

(*Id.* at 1.) OPIA made no such determination. As Plaintiff acknowledges, the findings regarding

Nitti were focused on several OPS investigations not involving Plaintiff. It is in the context of

those investigations that OPIA found that Nitti had engaged in misconduct, warranting his

termination. Moreover, the gravamen of this misconduct is that Nitti misdirected the focus of the

investigation to the author of the anonymous letter. In other words, Nitti improperly attempted to

ascertain the name of the individual who had accused another trooper of making a racist comment after OPS determined that the accusation was unfounded.

Although certain aspects of this report may hypothetically be introduced to impeach Nitti's general character for truthfulness, Plaintiff has not offered the report to dispute any of the specific facts presented by Defendants. Indeed, this Court's sole focus at the summary judgment stage is on material facts in dispute, and those undisputed facts compel the Court's holding. Furthermore, the eight members of the Reenlistment Board—not Nitti—denied Plaintiff reenlistment. The Board based its decision on many factors, including Plaintiff's testimony, in which he "avoided taking responsibility," "showed no remorse for any questionable activity that he may have been associated with," and was "unable to recognize his poor choices in judgment and decision making." (Defs. SUMF ¶¶ 118; Pl. SUMF Response ¶¶ 118.) Also, Nitti, as set forth below, is not the sole source of the undisputed facts on which this Court rests its grant of summary judgment. The core undisputed facts arise from both Plaintiff and Oxford's photographs on Instagram, Plaintiff's own admissions, and information from other New Jersey State Police employees and gang experts at two county prosecutor's offices. Thus, the Court declines to deny summary judgment based on the OPIA report.

## B. FIRST AMENDMENT RETALIATION

Defendants argue that they are entitled to summary judgment on Plaintiff's First Amendment retaliation claim because Plaintiff's social media post about the Chesimard t-shirt was not protected speech and Plaintiff's employment would not have been extended even if the speech had not occurred. (ECF No. 46-1 ("Defs. MSJ") at 14.) The United States Court of Appeals for the Third Circuit has established a "three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment": (1) "the employee must show the activity is protected," (2) "the employee must show the protected activity was a substantial factor

in the alleged retaliatory action," and (3) "the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." *McClement v. Port Auth. Trans-Hudson Corp.*, No. 11-06839, 2022 WL 111047, at \*11 (D.N.J. Jan. 12, 2022) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)). A public employee's speech is protected if it is "on a matter of public concern" and "the employee's interest in expressing herself on this matter [is] not [] outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (internal quotation marks omitted).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Falco v. Zimmer*, 767 F. App'x 288, 300 (3d Cir. 2019). The "content, form, and context" of a statement "encompasses the employee's motivation as well as whether it is important to our system of self-government that the expression take place." *Id.* at 302 (internal quotation marks omitted). "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001). To determine whether a statement involves a matter of public concern, courts must conduct "a particularized examination of each activity for which the protection of the First Amendment is claimed . . . while taking care not to cherry pick something that may impact the public while ignoring [its] manner and context." *Falco*, 767 F. App'x at 302 (internal quotation marks and citations omitted). "If, for example, a discrete unit of speech addresses only the employee's own problems and, even if those problems brush ever so gently

against a matter of public concern by virtue of that employee's public employment, then that speech is merely a personal grievance." *Id.* (internal quotation marks omitted).

Regarding an employee's interests versus that of the State, the "employee's interest in speaking" must "outweigh the government's in promoting workplace efficiency and avoiding disruption." *Fenico v. City of Phila.*, 70 F.4th 151, 166 (3d Cir. 2023). "[A]n employer need not show that the speech in question caused actual disruption to its operations . . . a reasonable likelihood of such disruption will suffice." *Fenico*, 70 F.4th at 166. The Supreme Court of the United States has "deferred heavily to employers' reasonable interpretations of employee speech and predictions of disruption—especially where . . . the employer has performed an internal investigation into the matter" and even "when the speech involved is on a matter of public concern." *Id.* at 166, 168 (quoting *Waters*, 511 U.S. at 673). An employer, however, must still establish "more than unadorned speculation as to the impact of speech," showing "likely disruption through record support." *Id.* at 166 (internal quotation marks omitted).

The Court's inquiry on First Amendment retaliation begins and ends with its determination of whether Plaintiff's speech was protected. Defendants argue that Plaintiff's social media post "had a strong ability to create, and indeed, did create, disruption in the workplace by causing fellow officers to question Plaintiff's loyalty to their mission," undermining the "heightened sense of trust and harmony required amongst police officers to perform their very dangerous job and maintain public safety." (Defs. MSJ at 18–19.) Plaintiff provides no response to this argument. He also does not dispute the facts necessary to decide this issue. (Pl. SUMF Response ¶¶ 5–23.)

As an initial matter, although Plaintiff's motivation for sharing his cousin's "Black Excellence" t-shirt was, in part, to promote its sale, (Defs. SUMF ¶¶ 5–9; Pl. SUMF Response ¶¶ 5–9), the subject matter of the t-shirt can "fairly be considered" to relate to a matter of social

concern to the community. *See Baldassare*, 250 F.3d at 195. Featuring the title "Black Excellence," the t-shirt depicted "well-respected" historical Black women, such as Harriet Tubman and Maya Angelou. (Defs. SUMF ¶ 8; Pl. SUMF Response ¶ 8; *see also* ECF No. 46-3 at 125.) Because of its subject matter and because Defendants have not challenged this aspect of Plaintiff's post, the Court assumes for purposes of its assessment that Plaintiff's speech was on a matter of public concern.

Where Plaintiff fails as a matter of law is in proving that his interest in promoting this t-shirt outweighed any injury the speech could cause to the interest of the New Jersey State Police in promoting the efficiency of the public services it performs through its troopers. The t-shirt promoted by Plaintiff on his personal social media account undisputedly featured a photograph of Chesimard. (Defs. SUMF ¶ 10; Pl. SUMF Response ¶ 10.) Chesimard, who has been listed on the FBI's Most Wanted Terrorists List since 2013, was convicted in 1977 for the first-degree murder of New Jersey State Trooper Werner Foerster. (Defs. SUMF ¶¶ 8–15; Pl. SUMF Response ¶¶ 8–15.) Chesimard escaped from prison in 1979 and remains a fugitive. (Defs. SUMF ¶¶ 8, 13; Pl. SUMF Response ¶¶ 8, 13.) Plaintiff's social media post circulated "among troopers" and prompted commentary within a Facebook group comprised of both current and retired New Jersey State Troopers. (Defs. SUMF ¶¶ 18–20; Pl. SUMF Response ¶¶ 18–20; *see also* ECF No. 46-3 at 127–129.) One of the members of that group expressed, "everyone knows who [sic] side [Plaintiff] is on, and what side he would take." (Defs. SUMF ¶ 20; Pl. SUMF Response ¶ 20; *see also* ECF No. 46-3 at 128.) Plaintiff admitted in his deposition that his social media post could cause a lack of harmony, upset fellow troopers, or cause them to not trust him. (Defs. SUMF ¶ 46; Pl. SUMF Response ¶ 46; *see also* Pl. Tr. at 45:1–9.) After seeing the posting, Trooper Serafin reported Plaintiff to Staff Sergeant Doyle, which ultimately led to an OPS investigation into Plaintiff's

conduct. (Defs. SUMF ¶¶ 16–17; Pl. SUMF Response ¶¶ 16–17.) Plaintiff was relieved of his duty weapon, police powers, and authority of the police before later being denied reenlistment. (Defs. SUMF ¶ 23; Pl. SUMF Response ¶ 23.)

Based on this undisputed record evidence, the Court finds that Plaintiff cannot prove as a matter of law that his interest in the post outweighed the State's interest in promoting workplace efficiency and avoiding disruption. Police work necessarily involves quickly evolving, life and death situations where absolute trust and reliance on fellow officers are paramount to protect the public at large and trooper colleagues. *See Tindle v. Caudell*, 56 F.3d 966, 971–72 (8th Cir. 1995) ("[P]olice departments function as paramilitary organizations charged with maintaining public safety and order . . . The need for harmony and close working relationships between co-workers in a police department is of great importance."); *Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1293 (11th Cir. 2000) (citing the "heightened need for order, loyalty, morale, and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers"); *see also Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 908 (9th Cir. 2021) (reasoning that there is a "special need for police departments to avoid disruption to provide public safety"). It is reasonable to predict that a New Jersey State Trooper's promotion, for profit or otherwise, of a notorious fugitive and convicted murderer of a fellow New Jersey State Trooper as an example of "Black Excellence" alongside other revered female Black leaders is likely to cause disruption among troopers and undermines the State's interest in maintaining trust and harmony within its state police force. Indeed, the undisputed record evidence demonstrates that Plaintiff's post did, in fact, cause disruption. The post was circulated among troopers, garnered online commentary about Plaintiff's lack of loyalty, was reported up the chain after a fellow trooper saw it, and prompted an internal investigation into Plaintiff's conduct. Plaintiff

acknowledged that his post could cause a lack of harmony among troopers and a lack of trust in him. (Defs. SUMF ¶ 46; Pl. SUMF Response ¶ 46; *see also* Pl. Tr. at 45:1–9.) The Court defers to this reasonable prediction of disruption. *See Fenico*, 70 F.4th at 166, 168.

The Fifth Circuit's decision in *Boyd v. Mississippi Department of Public Safety* is also instructive on this point. In that case, the plaintiff, a White trooper and captain, sent an email to other officers and employees of the department with a list of grievances. *Boyd v. Mississippi Dep't of Pub. Safety*, 751 F. App'x 444, 447 (5th Cir. 2018). In his email, the plaintiff stated that the department's "promotion policies and testing . . . favor[ed] one race over the others." *Id.* The plaintiff himself admitted that his grievances could be viewed as "in-fighting" and expressed not wanting his email to cause "hatred and animosity" among the officers. *Id.* at 450. The plaintiff's superiors subsequently transferred him from his current division to the "salvage division" and removed him from the SWAT team because his email had caused a "racial ruckus," tension within his division, and SWAT team members expressed not "feel[ing] safe going into a building" with him. *Id.* The plaintiff sued for First Amendment retaliation. *Id.* at 448. In affirming the district court's grant of summary judgment, the Fifth Circuit reasoned that the plaintiff's email "interfered with the operations of the department" and that the plaintiff's superiors were "justified" in moving the plaintiff to a new division and removing him from the SWAT team to "maintain close working relationships and discipline within those groups." *Id.* at 450. The court held that these interests of maintaining order and discipline within its trooper ranks outweighed the plaintiff's interest in free speech. *Id.*; *Graziosi v. City of Greenville*, 775 F.3d 731, 740 (5th Cir. 2015) (holding that a police officer's First Amendment interest in posting critical statements on social media concerning the police chief's leadership did not outweigh the police department's interest in preserving loyalty and close working relationships).

Like *Boyd*, the Court concludes that Plaintiff cannot show as a matter of law that his interest in free speech outweighed the State's interest in the "heightened sense of trust and harmony required amongst police officers to perform their very dangerous job and maintain public safety," (Defs. MSJ at 19). *See Persico v. City of Jersey City*, 67 F. App'x 669, 674 (3d Cir. 2003) (finding that the police department's "substantial interest in maintaining its rules and regulations" outweighed the plaintiff's interests in his speech as evidenced by the police department's "Internal Affairs Unit investigations, the referral of the case to the prosecutor's office, the order to stop investigating, and the disciplinary hearing"); *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) (concluding that the city's interest in maintaining a relationship of trust and avoiding disruptive effects between the Black community and police and fire departments outweighed expressive interests of those police and firefighters while off-duty). Thus, the Court grants summary judgment in favor of Defendants on Plaintiff's First Amendment retaliation claim.

## C.  RACE DISCRIMINATION AND RETALIATION

Plaintiff pursues claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD"). The Court analyzes these claims pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, under that framework, the plaintiff must establish a *prima facie* case of discrimination. *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 539 (D.N.J. 2022) (citing *McDonnell Douglas*, 411 U.S. at 802). If established, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant advances a legitimate, non-discriminatory reason, "the burden shifts back to the plaintiff to prove that the reason is pretextual, and the real reason for the adverse action is discrimination." *Id.*

1. Prima Facie Case

Defendants argue that Plaintiff has failed as a matter of law to establish the *prima facie* case for both race discrimination and retaliation. (Defs. MSJ at 26–35.) To prove the *prima facie* case for race discrimination, a plaintiff must show (1) he is a member of the protected class, (2) he is qualified for the job that he held, (3) he suffered an adverse employment action, and (4) the action occurred under circumstances that would give rise to an inference of discrimination. *Ewell v. NBA Properties, Inc.*, 94 F. Supp. 3d 612, 620 (D.N.J. 2015) (citing *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)). To establish a *prima facie* case for retaliation, a plaintiff must prove that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Phillips*, 624 F. Supp. 3d at 546 (citing *Carvalho-Grevious v. Delaware State Uni.*, 851 F.3d 249, 257 (3d Cir. 2017)).

i.    Inference of Discrimination

Defendants argue that the circumstances of Plaintiff's non-reenlistment do not give rise to an inference of racial discrimination. (Defs. MSJ at 27.) They assert that the comparators identified by Plaintiff are "so distinct" from Plaintiff's circumstances they cannot prove this element of the *prima facie* case. (*Id.* at 28–30.) Plaintiff, again, makes no response to this argument. A plaintiff can prove circumstances giving rise to an inference of unlawful discrimination by "either (1) introducing 'evidence of comparators . . .'; or (2) relying on 'circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.'" *Dor v. TD Bank*, No. 22-18955, 2023 WL 9017558, at *3 (D.N.J. Dec. 29, 2023) (quoting *Greene*, 557 F. App'x at 195).

"Comparator evidence" is "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Phillips*, 624 F. Supp.

3d at 540 (internal quotation marks omitted). "Similarly situated" does not "necessarily mean identically situated," but "the plaintiff must nevertheless be similar in all relevant respects." *Id.* (internal quotation marks omitted). "Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated." *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011). In the context of "workplace disciplinary and/or personnel actions," relevant factors include a showing that the two employees (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*; *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009); *Bailey v. S. Jersey Port Corp.*, No. 19-12316, 2020 WL 5653140, at *3 (D.N.J. Sept. 23, 2020) ("Similarly situated means that purported comparators must have committed offenses of comparable seriousness." (internal quotation marks omitted)); *see also McDonnell Douglas*, 411 U.S. at 804 (finding that a plaintiff may demonstrate pretext by presenting evidence that comparators were involved in acts "of comparable seriousness" to the plaintiff but were treated more favorably).

Here, Plaintiff does not dispute the facts about his alleged comparators, and he does not present any counterstatements of fact to support an inference of race discrimination. (Defs. SUMF ¶¶ 124–132; Pl. SUMF Response ¶¶ 124–132.) The three comparators—Troopers Brennan, Akyol, and Maliszewski—are all Caucasian. (Defs. SUMF ¶ 124; Pl. SUMF Response ¶ 124.) Brennan, who was involved in an alcohol-related accident, was suspended for 90 days without pay and allowances and was subject to an "independent alcohol and five-point promotional deduction for four years." (Defs. SUMF ¶ 125; Pl. SUMF Response ¶ 125.) Akyol allegedly shared racist statements and sent racist text messages. (Defs. SUMF ¶ 126; Pl. SUMF Response ¶ 126.) OPS opened an investigation, but, before the disciplinary process, Akyol was involved in a criminal

matter and forfeited his public employment. (Defs. SUMF ¶¶ 127–129; Pl. SUMF Response ¶¶ 127–129.) Maliszewski allegedly "stole time" and lied about his whereabouts while on duty. (Defs. SUMF ¶ 130; Pl. SUMF Response ¶ 130.) There are no OPS records regarding this alleged misconduct. (Defs. SUMF ¶ 131; Pl. SUMF Response ¶ 131.) Maliszewski received counselling in lieu of formal discipline regarding "other issues, such as failing to document a return to single patrol from dual patrol." (Defs. SUMF ¶ 132; Pl. SUMF Response ¶ 132.)

Based on these undisputed facts, the Court finds as a matter of law that these three individuals are not similarly situated to Plaintiff for several reasons. First, the undisputed facts do not demonstrate that Akyol was treated more favorably by Defendants. Like Plaintiff, OPS investigated Akyol's conduct. However, before the conclusion of the disciplinary process, Akyol became involved in a criminal matter and forfeited his employment. Like Plaintiff, Akyol is no longer a trooper. As for Maliszewski and Brennan, the Court finds that there are circumstances differentiating their conduct from Plaintiff's. Plaintiff offers no evidence to support his allegation that Maliszewski stole time and lied about his whereabouts. Such conduct is, therefore, unsubstantiated by the record. Even if Plaintiff had provided evidence beyond mere allegation, Plaintiff's conduct, as set forth below, was more egregious and far more disruptive to the "heightened need for order, loyalty, morale, and harmony" among police officers to perform their very dangerous job and maintain public safety. *Oladeinde,* 230 F.3d at 1293. The same reasoning applies to Brennan's alcohol-related accident. Alcohol abuse is a serious problem affecting society at large, including police officers, and this Court certainly does not condone an officer abusing alcohol and getting behind the wheel. Brennan's accident was a significant lapse in judgment that garnered a serious punishment. However, in terms of the promotion of harmony among troopers,

Brennan's conduct sits in stark contrast to Plaintiff's seeming attempt to profit from the promotion of a notorious cop killer.

Not only did Plaintiff's social media post openly laud a fugitive that had murdered another New Jersey State Trooper, but he also confirmed that he was familiar with Chesimard based on his police training and had seen her image in State police stations "more times than he could count." (Defs. SUMF ¶ 50; Pl. SUMF Response ¶ 50.) In addition, although Plaintiff removed the image of the t-shirt from his social media accounts, two months later, he "liked" a photograph of individuals wearing the t-shirt on his personal Instagram account. (Defs. SUMF ¶¶ 51–52; Pl. SUMF Response ¶¶ 51–52.)

The Chesimard t-shirt was also not the only undisputed reason why Plaintiff was not reenlisted. Plaintiff's questionable associations with gang members were also of particular concern to the New Jersey State Police. None of the following facts related to these associations are in dispute. The OPS investigation revealed that Plaintiff was very close with Oxford, as they were related as cousins, "went to college together, formed Top Gunnerz together, purchased a house together, and founded Royalty Clothing Company together." (Defs. SUMF ¶¶ 5, 84; Pl. SUMF Response ¶¶ 5, 84.) Because of their close relationship, certified gang experts reviewed photographs from Oxford's Instagram account, which revealed "indicia of gang affiliation such as the use of red clothing, Cincinnati Reds baseball hats, and hand signs specific to the Fruit Town Brims Bloods Street Gang, the 'home' chapter of the Bloods faction in Newark." (Defs. SUMF ¶¶ 85, 88, 90; Pl. SUMF Response ¶¶ 85, 88, 90.) The analysis connected Oxford to over 60 members of the Bloods Street Gang, including Bloods gang member Donald "Monk" Oliver. (Defs. SUMF ¶ 92; Pl. SUMF Response ¶ 92.) Plaintiff and Oliver followed each other on social media. (*Id.*) Images related to Plaintiff's social media accounts featured Plaintiff and Oxford associating with

individuals "wearing red clothing, including Cincinnati Reds baseball hats, and displaying hand signs." (Defs. SUMF ¶ 27; Pl. SUMF Response ¶ 27.)[10] Those images also featured Plaintiff displaying hand signs specific to the Fruit Town Brims Bloods Street Gang. (Defs. SUMF ¶ 33; Pl. SUMF Response ¶ 33.)[11]

The OPS investigation also revealed a connection between the motorcycle club that Plaintiff founded, Top Gunnerz, and the outlaw motorcycle gang, Thug Riders. (Defs. SUMF ¶ 93; Pl. SUMF Response ¶ 93.) Images on Oxford's Instagram account depict him in a Top Gunnerz vest socializing at the Thug Riders clubhouse. (Defs. SUMF ¶ 104; Pl. SUMF Response ¶ 104.) According to gang experts, if an individual "wears their own colors to another club's clubhouse known as an outlaw motorcycle club, that club will be considered an associate club or a support club." (Defs. SUMF ¶ 94; Pl. SUMF Response ¶ 94.) Plaintiff and Ruben Morales, the president of Thug Riders, also followed each other on social media. (Defs. SUMF ¶¶ 93, 95; Pl. SUMF Response ¶¶ 93, 95.) Plaintiff, who was president of Top Gunnerz for eight years, admitted that he

---

[10] While Defendants attach as exhibits a handful of images posted on the Top Gunnerz social media page, their resolution is such that the Court cannot clearly discern what they each portray. (ECF No. 46-3 at 116–123.) However, Plaintiff does not dispute that he, his cousin, and others are depicted in social media images wearing red clothing, including Cincinnati Reds baseball hats, and displaying hand signs. (Defs. SUMF ¶¶ 27, 36–37; Pl. SUMF Response ¶¶ 27, 36–37.) Plaintiff's self-serving statement to Nitti during the OPS investigation that this clothing and these hand signs were "based on fashion and hip-hop culture," (Defs. SUMF ¶ 101; Pl. SUMF Response ¶ 101), is not supported by any specific facts in the record. Therefore, the Court finds that this statement is insufficient evidence to create a jury question. *Heffron*, 270 F. Supp. 2d at 574–75 ("[I]n order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on vague, self-serving statements which are unsupported by specific facts in the record." (internal quotation marks omitted)).

[11] Plaintiff denied this fact in his response to Defendants' Statement of Material Facts. (Pl. SUMF Response ¶ 33.) However, to establish that a factual dispute exists, Plaintiff must offer "specific evidence found in the record that contradicts the evidence" presented by Defendants. *Van Horn v. Suhor Indus., Inc.*, 829 F. Supp. 2d 321, 325 (W.D. Pa. 2011) (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990)). The testimony cited to support Plaintiff's denial states that Nitti was not aware that Plaintiff had been "criminally charged with anything as it relates to any affiliation with the Crips as a street gang." (Nitti Tr. at 59:6–9.) The Court finds that Plaintiff has failed to offer record evidence contradicting the fact presented in Paragraph 33 of Defendants' Statement of Material Facts and, therefore, deems that fact undisputed.

initially lied to Nitti about not knowing current members of Top Gunnerz and was later able to identify various members when Nitti showed him photographs. (Defs. SUMF ¶¶ 96–99; Pl. SUMF Response ¶¶ 96–99.) Plaintiff also initially denied any relationship between Top Gunnerz and Thug Riders but later indicated that he was friends with the former president of Thug Riders and knew of its "innerworkings." (Defs. SUMF ¶¶ 102–103; Pl. SUMF Response ¶¶ 102–103.)

In October 2016, New Jersey State Police conducted surveillance of a Top Gunnerz Halloween party, where the clothing color theme was red and photographs from the event reveal gang hand gestures. (Defs. SUMF ¶ 53; Pl. SUMF Response ¶ 53.) During the surveillance, officers observed Plaintiff's vehicle outside of the party. (Defs. SUMF ¶ 55; Pl. SUMF Response ¶ 55.) [12]

It is also undisputed that Plaintiff disobeyed both written and verbal orders. Plaintiff disobeyed a written order when he traveled on separate occasions to Dallas, New Orleans, Myrtle Beach, Miami, and Amsterdam with Oxford without submitting a travel itinerary. (Defs. SUMF ¶¶ 57–58; Pl. SUMF Response ¶¶ 57–58.) Although Plaintiff believed that he only had to submit a travel itinerary for international trips, he still failed to submit one for his Amsterdam trip. (Defs. SUMF ¶ 59; Pl. SUMF Response ¶ 59.) Plaintiff also received a verbal warning from his supervisor to refrain from sharing inappropriate images on social media, after which he shared on social media an image of his son at the New Jersey State Police Hamilton Station. (Defs. SUMF ¶¶ 71–72; Pl. SUMF Response ¶¶ 71–72.) The post violated the New Jersey State Police's social media policy, which prohibits sharing "State Police emblems, logos, troopers and equipment on personal social media accounts." (Defs. SUMF ¶ 73; Pl. SUMF Response ¶ 73.) Plaintiff's supervisor told him to

---

[12] In addition, the officers noted the scent of marijuana emanating from the clubhouse and Plaintiff's vehicle. (Defs. SUMF ¶ 55; Pl. SUMF Response ¶ 55.)

remove the post and refrain from posting future inappropriate images. (Defs. SUMF ¶ 74; Pl. SUMF Response ¶ 74.)

Finally, it is undisputed that Plaintiff made several intentionally false reports. Nitti presented Plaintiff with sixteen motor vehicle warnings that "appeared to be falsely issued." (Defs. SUMF ¶ 78; Pl. SUMF Response ¶ 78.) Plaintiff admitted that he "failed to properly fill out the warnings" and, at least in one instance, falsely entered a warning as "issued" in the New Jersey State Police automated dispatch system when his warning book was blank. (Defs. SUMF ¶¶ 79–81; Pl. SUMF Response ¶¶ 79–81.)[13]

Taken together, the Court finds that the foregoing undisputed facts demonstrate significant differentiation between Plaintiff's conduct and that of Brennan, Akyol, and Maliszewski. Therefore, these individuals are not similarly situated to Plaintiff. There are no other alleged comparators identified in the record. Plaintiff also presents no additional evidence to the Court of circumstances giving rise to an inference of discrimination. Accordingly, the Court concludes, as a matter of law, that Plaintiff cannot meet the *prima facie* case for race discrimination. The Court grants summary judgment in Defendants' favor on Plaintiff's race discrimination claim.

### ii.    Protected Activity

Regarding retaliation, Defendants argue that Plaintiff has failed to establish that he engaged in protected activity and that there is a causal connection between the protected activity and his

---

[13] The New Jersey State Police also relied on additional OPS findings in denying Plaintiff reenlistment. However, Plaintiff has disputed various facts regarding those other findings, including that his social media posts appeared to support ideologies similar to that of the Black Liberation Army, that he was a co-owner of Royal Clothing Company with Oxford, that Royal Clothing Company and Top Gunnerz should have been registered with the State as a business, and that Plaintiff, Oxford, and other members of Top Gunnerz were in group photos using street gang hand signs. (Defs. SUMF ¶¶ 43, 47, 69, 86; Pl. SUMF Response ¶¶ 43, 47, 69, 86.) The Court concludes that, even without relying on these disputed facts, the conduct for which Plaintiff was denied reenlistment was not comparable, as a matter of law, to Brennan, Akyol, and Maliszewski's and, therefore, Plaintiff cannot prove a *prima facie* case of race discrimination.

non-reenlistment. (Defs. MSJ at 31–35.) "Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). "[A] person engages in a protected activity under the [NJ]LAD when that person opposes any practice rendered unlawful under the [NJ]LAD." *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 861 (D.N.J. 2019) (quoting *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1073 (N.J. Super. App. Div. 2005)). An employee's complaint "must concern discrimination and moreover, must be more than a general complaint of unfair treatment" to be considered protected activity. *Id.*

Here, Plaintiff offers no evidence that he engaged in protected activity before the decision was made not to reenlist him. Plaintiff's posting and subsequent endorsement of an image of a notorious convicted murderer of a New Jersey State Trooper on his personal social media, which the Court has already determined was not protected by the First Amendment, does not concern discrimination. Rather, it seeks to promote the individuals depicted on the t-shirt as examples of "Black Excellence." (Defs. SUMF ¶ 8; Pl. SUMF Response ¶ 8.) Plaintiff's post also bears no relation to his employment as a trooper or the New Jersey State Police. Plaintiff did submit an EEO complaint, but he did not do so until after he was denied reenlistment. (Defs. SUMF ¶ 133; Pl. SUMF Response ¶ 133.) Thus, that complaint cannot form the basis of Plaintiff's claim that he was denied reenlistment in retaliation for engaging in protected activity. Plaintiff has failed as a matter of law to prove the *prima facie* case for retaliation. Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiff's retaliation claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**. (ECF No. 46.)

An appropriate Order will accompany this Opinion.

Dated: March 31, 2025

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE